IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| SONJA MARIE MUSSER, | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 5:16-cv-00017 |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| NANCY A. BERRYHILL, | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | By: Joel C. Hoppe |
| Defendant. | ) | United States Magistrate Judge |

Plaintiff Sonja Marie Musser asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434. The case is before me by the parties' consent under 28 U.S.C. § 636(c)(1). Having considered the administrative record, the parties' briefs and oral arguments, and the applicable law, I find that substantial evidence supports the Commissioner's decision.

## I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); 20 C.F.R. § 404.1520(a)(4). The applicant bears the burden of proof at steps one through

four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Musser filed for DIB on May 31, 2012, alleging disability caused by anxiety, fibromyalgia, refractive trochanteric bursitis, ulnar neuropathy, and depression beginning on March 1, 2011, at which time she was forty-one years old. Administrative Record ("R.") 77, ECF No. 9. Disability Determination Services ("DDS"), the state agency, denied her claim at the initial, R. 77–88, and reconsideration stages, R. 90–105. On September 11, 2014, Musser appeared with counsel at an administrative hearing before ALJ Marc Mates and testified about her impairments, past work, and daily activities. R. 35–76. A vocational expert ("VE") also testified about Musser's past work and her ability to do other jobs in the national and local economies. R. 71–75.

On November 10, 2014, ALJ Mates issued a written decision denying Musser's DIB application. R. 12–26. He determined that she had not engaged in substantial gainful activity since March 1, 2011. R. 14. He then found that Musser had severe impairments of fibromyalgia, trochanteric bursitis, and obesity. *Id.* All other conditions, including her dry eyes, bilateral ulnar neuropathies, mouth lesions, stage I endometriosis, and depression, were deemed non-severe. R. 14–17. None of these impairments, alone or in combination, met or medically equaled the severity of one of the listed impairments. R. 17. As to Musser's residual functional capacity ("RFC"),[1] ALJ Mates determined that she could perform a range of sedentary work[2] in that she

---

[1] A claimant's RFC is the most he or she can do on a regular and continuing basis despite his or her impairments. 20 C.F.R. § 404.1545(a); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

[2] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying [objects] like docket files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a), 416.967(a). A person who can meet those lifting requirements can perform a full range of sedentary work if he or she can sit for

could lift and carry twenty pounds occasionally and ten pounds frequently; stand and walk for four hours and sit for six hours in an eight-hour workday; occasionally balance and stoop; never climb ladders, ropes, or scaffolds; and occasionally reach overhead and push and pull with the upper extremities bilaterally. *Id.* She also should avoid exposure to workplace hazards, such as unprotected heights and dangerous moving machinery. *Id.* Musser could not perform her past relevant work as a college professor. R. 24. She could, however, perform other jobs, including general office clerk, receptionist, inspector/grader, and assembler, that existed in significant numbers in the national and local economies. R. 24–25. Therefore, ALJ Mates concluded that Musser was not disabled. R. 26. The Appeals Council denied Musser's request for review, R. 1–4, and this appeal followed.

## III. Discussion

Musser frames the issues of her appeal as "[w]hether the ALJ committed error by failing to follow Social Security Ruling 12-2p and by misstating the medical evidence of record." Pl.'s Br. 2, ECF No. 12. The crux of this challenge concerns ALJ Mates's RFC determination, particularly as to his assessment of Musser's fibromyalgia and evaluation of her subjective statements about her symptoms. Musser also disputes the weight the ALJ assigned to the opinion of her treating physician, contending that it should have been afforded controlling weight, *id.* at 4–5, and she asserts that ALJ Mates erred at step two by finding that she did not have a severe eye impairment, *id.* at 5–6. Musser's arguments are not persuasive.

*A.*     *Severe Eye Impairment*

   *1.*     *Relevant Facts and Testimony*

---

about six hours and stand and/or walk for about two hours in a normal eight-hour workday. *See Hancock v. Barnhart*, 206 F. Supp. 2d 757, 768 (W.D. Va. 2002); SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996).

Musser did not allege disability because of an eye-related impairment in her initial DIB application. R. 77. She did, however, note some problems with her vision in her function reports submitted as part of her application for benefits, stating that her blurry vision made it difficult to read and that she regularly used prescription glasses. *See* R. 264, 266, 295, 301. She then testified at the administrative hearing that she experienced dry eyes as a side effect of some of her medications. R. 61. She stated that John Stathos, M.D., her ophthalmologist, put punctal plugs in her eyes, which "helped amazingly" at first. *Id.* The plugs eventually began to cause severe irritation by rubbing against her corneas, so Dr. Stathos removed them. R. 62. Musser noted that she began using Restasis eye drops, which also helped, although not as much as the plugs. *Id.*

Musser visited Dr. Stathos annually for eye treatment from 2011 through 2013. On February 3, 2011, Musser complained of blurry vision, but her visual acuity with correction was 20/25+ in the right eye and 20/20 in the left eye. R. 371. Dr. Stathos indicated that she had a congenital cataract in the right eye and instructed her to return in one year. R. 372. On February 9, 2012, Musser reported worsening vision, both up close and at a distance, in both eyes. R. 373. She also noted that she occasionally saw floaters and experienced a glare. *Id.* Her visual acuity with correction was 20/40 in the right eye and 20/25+ in the left eye. *Id.* Dr. Stathos increased her prescription strength, ordered her prescription bifocals, and instructed her to return in a year. R. 373–74. During a visit in 2013, Musser explained that she had not been able to wear her contact lenses for a month and a half because of dryness. R. 734. She had trouble with reading—although Dr. Stathos noted she took her glasses off to read—and sometimes she could not see the closed captioning on the television. *Id.* Her visual acuity with correction was 20/30- on the right and 20/25+ on the left. *Id.* Dr. Stathos again noted that Musser had a congenital cataract in the

right eye and instructed her to follow up in one year. R. 735. Musser returned on December 19, requesting punctal plugs. R. 762. Her visual acuity with correction was 20/25 on the right and 20/20 on the left. *Id.* Dr. Stathos scheduled her to return in ten days to receive the plugs. R. 763. On March 7, 2014, Musser followed up with continued complaints of dryness. R. 758. She had been using Restasis, which helped, but she still had blurred vision daily and experienced floaters and an "awful glare." *Id.* Her visual acuity with correction was 20/25 on the right and 20/20 on the left, and she had a moderately deep tear lake. *Id.* Dr. Stathos continued her on Restasis and advised her to keep her scheduled appointment. R. 759. Musser followed up with Dr. Stathos on July 8 and reported having pain after using Restasis drops. R. 792. She still experienced glare and dryness that prevented her from wearing contact lenses, but she had no new floaters. *Id.* Her visual acuity with correction was 20/20 in both eyes. *Id.* Dr. Stathos continued her on Restasis and instructed her to follow up in a year. R. 793.

2.    *Analysis*

At step two, the ALJ determines whether a claimant has a "severe medically determinable physical or mental impairment . . . or combination of impairments." 20 C.F.R. § 404.1520(a)(4)(ii).

> [A]n impairment or combination of impairments is considered "severe" if it significantly limits an individual's physical or mental abilities to do basic work activities; an impairment(s) that is "not severe" must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.

SSR 96-3p, 1996 WL 374181, at *1 (July 2, 1996); *see also* 20 C.F.R. §§ 404.1520(c), 404.1522(a). This determination "requires a careful evaluation of the medical findings that describe the impairment(s) . . . and an informed judgment about the limitations and restrictions

6

the impairment(s) and related symptom(s) impose on the individual's physical and mental ability to do basic work activities." SSR 96-3p, 1996 WL 374181, at *2.

In his opinion, ALJ Mates noted Musser's subjective statements about her eye and vision difficulties and accurately recited the medical evidence pertaining to her treatment with Dr. Stathos. R. 14–15. He explained that her visual acuity remained stable and was 20/20 in July 2014. R. 15. As such, he concluded that "[a]lthough she has complained of dryness, she has had minimal treatment and there is no evidence that she has a severe eye impairment." *Id.*; *see* 20 C.F.R. § 404.1522(b)(2) (noting that the term "basic work activities" includes "[c]apacities for seeing").

Musser contends that ALJ Mates erred in making this determination, but she does not point to any specific deficiency in the ALJ's opinion. Instead, she recites much of the same medical evidence and subjective report of symptoms as did the ALJ and concludes that she must have a severe impairment because her "symptoms result in more than a minimal effect on her ability to perform basic work activities." Pl.'s Br. 5–6. She does not, however, offer any explanation as to how her eye impairment causes functional limitation in her ability to perform basic work activities. Other than her subjective report of symptoms, nothing in the record shows the functional limitations she claims to experience from her vision problems. The ALJ's accurate discussion of the medical evidence—which showed stable vision that was no worse than 20/40 and that was at best 20/20—and his acknowledgment of conservative treatment provides substantial evidence to support his finding that Musser's eye condition did not cause more than minimal limitation and was non-severe.

Essentially, Musser asks this Court to revisit the record and find her eye impairment severe, but this Court does not have the authority to reweigh the evidence. *See Stevens v. Colvin*,

No. 6:14cv21, 2015 WL 5510928, at *4 (W.D. Va. Sept. 16, 2015) ("[E]ven if the court would have made contrary determinations of fact, it must nonetheless uphold the ALJ's decision, so long as it is supported by substantial evidence."). Accordingly, I find that the ALJ's step-two determination that Musser did not have a severe eye impairment is supported by substantial evidence.

B.    *RFC Challenge*

    1.    *Facts*

        a.    *Relevant Medical Evidence*

Musser primarily treated with M. Scott Hogenmiller, M.D., a rheumatologist, for her fibromyalgia and left hip pain. Over the course of many visits from 2011 through early 2014, Dr. Hogenmiller'a findings remained largely unchanged. For example, he consistently observed normal gait, no synovitis, no effusion, no joint swelling, multiple tender points, and tenderness to palpation over the greater left trochanter. *See* R. 432–33, 436–37, 442–43, 618, 620, 720, 744–46, 748–51. He indicated otherwise normal physical examinations and diagnosed fibromyalgia and left hip bursitis. *See id.* Dr. Hogenmiller prescribed medication, recommended physical therapy and gradual exercise, and administered five left hip injections. *See* R. 432–33, 436, 439, 441, 620, 720, 744, 748; *see also* R. 533, 536, 540, 543, 546. Per Musser's subjective reports, all of these treatment modalities offered some degree of relief at various times. *See* R. 433, 436, 439, 618, 620. Dr. Hogenmiller also completed two DDS evaluation forms detailing Musser's strength and range of motion. R. 564–65 (Oct. 29, 2012), 728–29 (June 7, 2013). Range of motion was slightly diminished in the thoracolumbar spine and the bilateral shoulders, but was otherwise normal. R. 565, 728. Musser's strength was 4/5 in the bilateral deltoids, but 5/5 elsewhere. R. 564, 729. Coordination, gait, and station were all normal, with only mild abnormal

hopping and mild abnormal one-foot station. *Id.* Babinski sign was absent, and reflexes were 1+ throughout. *Id.* Dr. Hogenmiller also noted on one occasion that Musser displayed some imbalance getting off the examination table. R. 746. In describing his treatment of Musser, Dr. Hogenmiller wrote on May 16, 2013, that she had been under his care

> for a diagnosis of fibromyalgia . . . . Her diagnosis is based on the presence of a clinical history of pain and fatigue typical for the disorder. In addition her examination has repeatedly been remarkable for greater than 11/18 tender points. She has been a patient at our clinic since January 12, 2010 and has shown very little overall improvement in the pain and fatigue symptoms. I have recommended that she apply for disability.

R. 712. Other than this May 2013 letter, however, Dr. Hogenmiller did not opine on Musser's functioning or condition.

Musser also intermittently saw Jack Otteni, M.D., an orthopedist. On March 6, 2012, Musser expressed interest in exploring the possibility of a trochanteric bursectomy to treat her hip condition, but Dr. Otteni declined because he had not performed the surgery before. R. 383. His physical examination findings were similar to Dr. Hogenmiller's, and he noted that palpation over Musser's trochanteric bursa "reproduces her pain and seems somewhat out of proportion." R. 384. Dr. Otteni examined X-rays of the pelvis and left hip, which were deemed normal. *Id.* Dr. Otteni diagnosed left hip trochanteric bursitis, chronic and severe, and referred Musser to the University of Virginia ("UVA") for a second opinion regarding the trochanteric bursectomy. *Id.* On March 12, James A. Browne, M.D., at UVA examined Musser and identified all normal findings except that Musser endorsed significant tenderness to palpation over her left greater trochanter. *See* R. 386–88. He also declined to pursue the surgery she requested as he did not have experience performing it. R. 388. Musser returned to Dr. Otteni on August 15, 2013, for an evaluation of her left hip pain. R. 741–43. She reported that she still had pain in her hip, although it was much improved, and in fact, her worst pain was in the groin. R. 741. Dr. Otteni observed a

normal physical examination with the exception that resisted hip flexion produced pain on the left, and he also noted that she did not use an assistive device for ambulation. R. 741–43.

As part of her treatment, Musser also regularly engaged in physical therapy. She was discharged at her own request on March 29, 2011, having achieved some of her goals. R. 498–500. She had a slightly antalgic gait, but it was noted that she had seventy percent improvement in symptoms and functioning over thirteen visits, although at times her functioning was limited by fibromyalgia flare-ups, and her prognosis was assessed as good. R. 499. Musser also participated in aqua therapy from October 5 through November 29. R. 496. She reported that she felt the pool was helping, but she was still really tired. *Id.* Upon discharge, the therapist noted that Musser responded well to the aquatic environment in managing her symptoms and had met all her goals (although some had been abandoned throughout the course of therapy). R. 496–97. Musser returned for more physical therapy in late 2012 and continued through February 12, 2013. R. 628. Although at times during these sessions Musser exhibited an abnormal gait and decreased strength, upon discharge, her symptoms in the right lower extremity had resolved and her symptoms in the left lower extremity were minimal. R. 628. Musser also reported that she was pleased with her progress overall and had decreased symptoms. *Id.* She was discharged with a home exercise program and given a good prognosis. *Id.*

On initial review of her application on November 5, 2012, DDS expert R.S. Kadian, M.D., found that Musser could lift and carry twenty pounds occasionally and ten pounds frequently; could stand and walk for six hours and sit for six hours in an eight-hour workday; was unlimited in her ability to push and pull; could frequently stoop, crouch, and climb ramps, stairs, ladders, ropes, and scaffolds; was unlimited in balancing, kneeling, and crawling; and was limited in bilateral reaching overhead. R. 84–86. On reconsideration review on June 18, 2013,

David C. Williams, M.D., reassessed Musser's physical functioning. R. 101–03. He affirmed most of Dr. Kadian's findings, but limited Musser to only four hours of standing and walking and opined that she had limited ability to push and pull with the bilateral upper extremities. R. 101–02.

> b.  *Musser's Submissions and Testimony*

Musser submitted two function reports as part of her application for benefits. R. 260–67, 295–302. She stated that she tried to be active on good days by taking care of her house, going to the gym twice a week, going out with her husband, or watching a movie, but on a bad day she stayed in bed. R. 260, 295. She experienced problems with personal care and pain affected her sleep, but she routinely prepared her own meals, engaged in household tasks, looked after rescue dogs in her home, went out occasionally to shop, and regularly went to the gym, doctor's office, and veterinarian's office. R. 261–64, 296–99. Her hobbies and interests included puzzles (chess and Sudoku), reading, knitting, quilting, watching videos, and playing with and taking care of dogs, but she struggled with knitting, quilting, and reading and could not do any activities on a bad day. R. 264, 299. She had problems with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, seeing, remembering things, completing tasks, concentrating, and using her hands. R. 265, 300. She could lift a twenty-pound dog a few times per day, stand for up to ten minutes, sit for thirty minutes in a recliner, and walk a quarter of a mile. *Id.* Stress exacerbated her pain, and she was afraid that rapid changes in routine would affect her physically. R. 266, 301. In his third-party function report, her husband confirmed many of these described limitations. R. 244–51.

At the administrative hearing, Musser testified that she currently took Gabapentin, Cymbalta, and Vicodin for pain and that they helped to some degree, but she still experienced

side effects such as dryness, blurred vision, and mouth pain. R. 40–41. Her hip bursitis had been present on and off since she was a teenager, but it got worse once the fibromyalgia developed. R. 56. Hip injections helped some of the time, but she did not experience complete relief and sought additional treatment. R. 57. Iontophoresis, a technique of delivering medicine through the skin using a battery powered patch, provided the most relief. R. 58–59. She was frequently tired and nauseous. R. 60. She had spent much of the week of the hearing lying down, and her hip made sitting uncomfortable. R. 51–52. As to daily activities, she occasionally volunteered as a Spanish language interpreter at local doctors' offices, and she had signed up to volunteer at the Virginia School for the Deaf and Blind in Staunton. R. 47. Musser and her husband also rehabilitated senior, special needs, small breed dogs in their home. R. 49. Musser would let them out of the house to the backyard and had to assist two of the dogs with mobility problems navigate two steps to return inside. R. 49–50. She did as many chores as she could around the house, but was generally only able to do about one task—whether it be laundry, the dishes, sweeping, mopping, or taking out the trash—per day. R. 54–55.

    *2.*     *Analysis*

Musser argues that ALJ Mates erred by misstating the record and by failing to adhere to the pertinent fibromyalgia social security ruling ("SSR"). *See* SSR 12-2p, 2012 WL 3104869 (July 25, 2012). At base, her argument is a challenge to the ALJ's RFC finding, including his assessment of Dr. Hogenmiller's letter opinion and his evaluation of Musser's subjective statements about her pain and symptoms. A claimant's RFC is the most she can do on a regular and continuing basis despite her impairments. 20 C.F.R. § 404.1545(a); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). It is a factual finding "made by the Commissioner based on all the relevant evidence in the [claimant's] record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31

(4th Cir. 2011) (per curiam), and it must reflect the combined limiting effects of impairments that are supported by the medical evidence or the claimant's credible complaints, *see Mascio v. Colvin*, 780 F.3d 632, 638–40 (4th Cir. 2015). The ALJ's RFC assessment "must include a narrative discussion describing" how specific medical facts and nonmedical evidence "support[] each conclusion," *Mascio*, 780 F.3d at 636, and why he discounted any "obviously probative" conflicting evidence, *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977); *see also Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014).

As noted above, the ALJ found severe impairments of fibromyalgia, trochanteric bursitis, and obesity. R. 14. In determining Musser's RFC, he first summarized the evidence, including her testimony and information from the three function reports. R. 18–20. He accurately recited the medical evidence, which generally revealed little to no abnormal findings related to her strength, range of motion, and gait, but did show significant tenderness involving her left hip. R. 20–23. ALJ Mates discussed her treatment—consisting of physical therapy, medications, exercise, and hip injections—and its relative success, as reported to her providers, in improving her symptoms. *Id.*

He then analyzed Musser's subjective statements and concluded that although her medically determinable impairments could cause some of the alleged symptoms, her (and her husband's) statements concerning the intensity, persistence, and limiting effects were not entirely credible. R. 20, 23. Specifically, ALJ Mates noted that the treatment records did not support her allegations regarding the severity of her limitations because the longitudinal record was generally unremarkable; the imagery and testing evidence did not provide objective support for her claims; repeated physical examinations did not reveal significantly decreased strength, sensation, or range of motion of any extremity; despite tenderness to palpation of the left hip, she generally

had full strength; and multiple notations from late 2012 into early 2013 indicated that she was well appearing and in no acute distress. R. 23. ALJ Mates also noted that Musser's treatment was generally routine, conservative, and unremarkable, and it included no trips to a specialist; her hip injections provided relief generally; and Dr. Otteni opined in March 2012 that her pain was out of proportion to her impairment. *Id.* The ALJ explained that Musser had acted inconsistently for someone asserting that she is completely disabled. *Id.* In particular, there was no evidence she had been prescribed a cane or that she had significant gait instability, balance problems, or reports of falling; an August 15, 2013, treatment note that her left hip pain was one-and-a-half months in duration belied her allegations of ongoing bursitis; and she engaged in significant activities, including working as an interpreter, preparing her own meals, loading the dishwasher, doing laundry, going out alone, driving a car, shopping in stores, and caring for pets. *Id.* ALJ Mates concluded by noting that although Musser's impairments imposed some limitations, they did not preclude her from performing sedentary jobs. *Id.* He also evaluated the opinion evidence, particularly Dr. Hogenmiller's recommendation of disability, which he gave little weight because it was inconsistent with the other evidence of record. R. 24.

Musser's first challenge to this RFC is that the ALJ did not follow SSR 12-2p. I disagree. SSR 12-2p explains that "a person can establish that he or she has [a medically determinable impairment] of [fibromyalgia] by providing evidence from an acceptable medical source." SSR 12-2p, 2012 WL 3104869, at *2. The evidence must include a physician's diagnosis and must be consistent with the criteria in either the 1990 American College of Rheumatology ("ACR") Criteria for the Classification of Fibromyalgia or the 2010 ACR Preliminary Diagnostic Criteria. *Id.* ALJs may also consider evidence from sources other than acceptable medical sources "to evaluate the severity and functional effects of the impairment(s)."

*Id.* at *4. In evaluating a claimant's subjective statements, the ALJ utilizes the same two-step approach as for any other impairment. *Id.* at *5. In determining the RFC for claimants with fibromyalgia, the ALJ "will consider the longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'" *Id.* at *6. SSR 12-2p specifically notes that common symptoms of fibromyalgia, such as widespread pain or fatigue, may result in exertional limitations that prevent a person from doing the full range of unskilled work and further that fibromyalgia claimants "may also have nonexertional physical or mental limitations because of their pain or other symptoms," as well as nonexertional environmental restrictions. *Id.*

As detailed above, ALJ Mates found that Musser had a severe impairment of fibromyalgia based on Dr. Hogenmiller's diagnosis. R. 14. The ALJ then discussed SSR 12-2p, R. 17, and his analysis of Musser's fibromyalgia focused on the factors identified in the policy. The ALJ also accurately recited the longitudinal record evidence, including Dr. Hogenmiller's notes and observations. He accounted for Musser's subjective statements about her fibromyalgia symptoms and explained why he did not find them entirely credible as to the intensity, persistence, and limiting effects of these symptoms. R. 18–20, 23–24. Accordingly, I find that the ALJ's discussion of the record as it pertained to Musser's fibromyalgia properly fit within the framework of SSR 12-2p.

Musser also asserts that ALJ Mates's determination that she could perform sedentary work was in error because Dr. Hogenmiller opined that her fibromyalgia symptoms such as pain and fatigue did in fact cause exertional and nonexertional limitations that rendered her disabled. Pl.'s Br. 3. Dr. Hogenmiller's letter indicates that Musser's *diagnosis* of fibromyalgia was based on the presence of pain, fatigue, and greater than eleven of eighteen tender points. R. 712.

Nowhere in the letter, however, does he explain how or even if these symptoms translate into specific *functional* limitations, much less that they supported greater functional limitations than imposed by the RFC. A diagnosis alone does not render a claimant disabled. *See* 20 C.F.R. § 404.1505 (defining disability); SSR 12-2p, 2012 WL 3104869, at *5 ("Once we establish that a person has a [medically determinable impairment] of [fibromyalgia], we will consider it in the sequential evaluation process to determine whether the person is disabled."). Indeed, in most cases, fibromyalgia is not a disabling condition. *See Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). Here, Musser appears to have conflated Dr. Hogenmiller's diagnosis with the presence of (unidentified) functional limitations that restrict her ability to work. She relies on her subjective report of fibromyalgia symptoms and her physicians' findings that she experienced pain, fatigue, and tender points, but none of those findings demonstrate work-preclusive limitations or are necessarily inconsistent with the ALJ's RFC determination.

Next, Musser takes issue with the ALJ's characterization of the evidence, but the examples she cites all concern the ALJ's assessment of her subjective statements. A proper credibility assessment of a claimant's subjective report of symptoms is essential in fibromyalgia cases because objective findings, aside from tender points, provide little insight into the severity of a person's fibromyalgia. *See Johnson v. Astrue*, 597 F.3d 409, 413 (1st Cir. 2009) (per curiam). In assessing the credibility of a claimant's symptoms, the ALJ should review other evidence in the record, such as a claimant's subjective statements, to assess her pain and other symptoms. *See Craig*, 76 F.3d at 595; 20 C.F.R. § 404.1529. In fact, "'a patient's report of complaints, or history, is an essential diagnostic tool' in fibromyalgia cases." *Johnson*, 597 F.3d at 412 (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003)).

The regulations set out a two-step process for evaluating a claimant's allegation that she is disabled by symptoms, such as pain, caused by a medically determinable impairment. *Fisher v. Barnhart*, 181 F. App'x 359, 363 (4th Cir. 2006) (citing 20 C.F.R. § 404.1529). The ALJ must first determine whether objective medical evidence shows that the claimant has a medically determinable impairment that could reasonably be expected to cause the kind and degree of pain alleged. 20 C.F.R. § 404.1529(a)–(b); *see also Craig*, 76 F.3d at 594. If the claimant clears this threshold, then the ALJ must evaluate the intensity and persistence of the claimant's pain to determine the extent to which it affects her physical or mental ability to work. SSR 16-3p, 2016 WL 1119029, at *4 (Mar. 16, 2016); *see also Craig*, 76 F.3d at 595. The ALJ cannot reject the claimant's subjective description of her pain "solely because the available objective medical evidence does not substantiate" that description. 20 C.F.R. § 404.1529(c)(2). The ALJ must consider all the evidence in the record, including the claimant's other statements, her daily activities, her treatment history, any medical-source statements, and the objective medical evidence, *Craig*, 76 F.3d at 595 (citing 20 C.F.R. § 404.1529(c)), and must give specific reasons, supported by relevant evidence in the record, for the weight assigned to the claimant's statements, *Eggleston v. Colvin*, No. 4:12cv43, 2013 WL 5348274, at *4 (W.D. Va. Sept. 23, 2013).

ALJ Mates's discussion here was sufficient. To be sure, that the record is generally unremarkable pertaining to Musser's physical examinations does not, by itself, undermine her complaints of pain due to fibromyalgia. *See Johnson*, 597 F.3d at 413; *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988) (noting that the absence of signs such as joint swelling, reduced range of motion, or diminished strength do not necessarily detract from a claimant's allegation of severe fibromyalgia pain); *cf. Ellis v. Colvin*, No. 5:13cv43, 2014 WL

2862703, at *8 (W.D. Va. June 24, 2014) ("[D]istrict courts in this circuit have recognized that a lack of objective findings is not a good reason to discount a treating physician's opinion regarding the existence or severity of a patient's fibromyalgia.").

That said, the other reasons proffered by ALJ Mates withstand scrutiny. For one, Musser's treatment was generally routine and conservative. This observation has more force regarding Musser's hip impairment as medications and injections, such as those administered to her, have been considered conservative by the Fourth Circuit and this Court. *Dunn v. Colvin*, 607 F. App'x 264, 272–75 (4th Cir. 2015); *Gregory v. Colvin*, No. 4:15cv5, 2016 WL 3072202, at *5 (W.D. Va. May 6, 2016) ("It was reasonable for the ALJ to characterize [Plaintiff's] course of treatment, consisting of pain medication, physical therapy, and steroid injections, as 'conservative.'"), *adopted by* 2016 WL 3077935 (W.D. Va. May 31, 2016). Although Musser herself sought out surgical intervention, her doctors declined to perform the surgery, and Dr. Otteni expressly noted that he did not recommend it. R. 384. As such, this is not a case where Musser required more aggressive treatment yet received only conservative treatment for other reasons. *See Dunn*, 607 F. App'x at 275.

Even recognizing that treatment for fibromyalgia typically is conservative, *see Johnson*, 597 F.3d at 412, Musser's fibromyalgia treatment, consisting of therapy and light exercise, could be properly characterized as less intense that other treatment methods, *see Burger v. Colvin*, 7:14cv190, 2015 WL 5347065, at *7 (W.D. Va. Sept. 14, 2015). The record also indicates that her treatment was effective, as Musser reported on several occasions that her medication helped, as well as that she was pleased with her progress in therapy and that her pain and symptoms had improved. *See, e.g.*, R. 433, 436, 439, 496, 499, 628, 644, 646. It is well settled that pain is not disabling if it can be controlled with treatment. *See Gross v. Heckler*, 785 F.2d 1163, 1166 (4th

Cir. 1986); *see also Hays v. Sullivan*, 907 F.2d 1453, 1457–58 (4th Cir. 1999) ("An individual does not have to be pain-free in order to be found 'not disabled.'"). Thus, ALJ Mates properly reasoned that Musser's conservative and routine treatment belied her allegations of disabling symptoms stemming from fibromyalgia and left hip bursitis.

Additionally, in assessing her subjective statements about the severity of her symptoms, the ALJ may properly consider whether Musser acted inconsistently for someone asserting complete disability. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (per curiam) (finding no error when "the ALJ cited specific contrary testimony and evidence in analyzing Bishop's credibility"); *Manns v. Berryhill*, No. 4:16cv5, 2017 WL 3587177, at *3 (W.D. Va. Aug. 18, 2017) (discussing Manns's inconsistent statements regarding the extent of his drumming at church, which he previously acknowledged doing every other weekend, and noting that "Plaintiff was asked about his activities at church and denied doing any activities aside from prayer. While no one is accusing Plaintiff of living a double life as a modern Keith Moon, his lack of candor was properly considered."). Here, the record supports ALJ Mates's reasoning that Musser's subjective report of debilitating pain and other symptoms was inconsistent with or not otherwise supported by the record. Although Musser said she needed to use a cane, there is no evidence she was prescribed one, and Dr. Otteni noted on August 15, 2013, that she did not use an assistive device to ambulate. R. 741. She occasionally reported falling, but there is nothing in the record indicating that these "falls" had anything to do with the medical impairments at issue in this case; indeed, they appear to be related to her ankles. *See* R. 445, 778. Dr. Hogenmiller also found her gait, coordination, and station almost entirely normal during two separate neurological evaluations, R. 564, 729, and he observed normal or non-

antalgic gait during regular follow-ups, R. 442–43, 618, 716; *see also* R. 384, 387, 743

(observations of normal gait by Drs. Otteni and Browne).[3]

Moreover, Musser's stated activities were inconsistent with her allegations of disability.

In discounting her statements about her pain and symptoms, the ALJ identified her reports that

she prepared her own meals, loaded the dishwasher, cleaned, did laundry, drove a car, went out

alone, shopped in stores, cared for pets (including animal rescue), and acted as a part-time

interpreter. R. 23. Musser reported she went to the gym twice a week to comply with

recommended treatment and occasionally went on her own beyond what was prescribed. She

socialized with her husband and friends, including going out for a drink or coffee. She

maintained the house and engaged in chores on an occasional basis. It is appropriate for the ALJ

to consider these activities and the work-related functional abilities they demonstrate in

evaluating a claimant's statements about her symptoms and pain. *See* 20 C.F.R. §

404.1529(c)(3). Although the ability to do activities of daily living does not necessarily translate

into the ability to perform substantial gainful activity and maintain competitive employment, *see*

*Miller v. Astrue*, No. 5:11cv55, 2012 WL 3068732, at *4 (W.D. Va. July 24, 2012) ("It is true

that minimal, transitory, and inconsistent aspects of daily living may have little or no bearing on

a claimant's ability to function full time in a work setting."), *adopted by* 2012 WL 6151980

(W.D. Va. Dec. 11, 2012), Musser's activities were not minimal and in fact were inconsistent

with her description of her symptoms in her function reports and her testimony at the

administrative hearing. Furthermore, the ALJ assessed a very restrictive RFC, limiting Musser to

sedentary work. *See* SSR 96-9p, 1996 WL 374185, at *3. This assessment of Musser's functional

---

[3] A couple of treatment notes provided contrary observations. Dr. Hogenmiller observed antalgic gait on November 1, 2012, R. 620, and he noted that Musser had some imbalance getting off the table on September 16, 2013, R. 744–46.

ability is reasonable considering her stated activities. Thus, for the reasons discussed above, ALJ Mates did not err in evaluating Musser's credibility.

Last, Musser challenges ALJ Mates's evaluation of the opinion evidence. Pl.'s Br. 4–5. An ALJ must consider all medical opinions in the record. See 20 C.F.R. § 404.1527(b). The ALJ must also explain the weight given to these medical opinions, *Radford v. Colvin*, 734 F.3d 288, 295–96 (4th Cir. 2013), and his "decision 'must be sufficiently specific to make clear to any subsequent reviewers the weight [he] gave' to the opinion and 'the reasons for that weight,'" *Harder v. Comm'r of Soc. Sec.*, No. 6:12cv69, 2014 WL 534020, at *4 (W.D. Va. Feb. 10, 2014) (citing SSR 96-2p, 1996 WL 274188, at *5 (July 2, 1996)).

Here, the ALJ evaluated Dr. Hogenmiller's May 16, 2013, letter and the opinions of the DDS reviewers, which were the only medical opinions in the record. R. 24. He gave little weight to Dr. Hogenmiller's summary recommendation of disability because it was inconsistent with the other evidence of record, but he gave partial weight to Dr. Hogenmiller's observation that Musser's fibromyalgia had improved since she stopped working because it was supportive of sedentary work.[4] *Id.* He also assigned partial weight to the DDS assessments, finding that some additional limitations were warranted. *Id.*

In her brief, Musser claims that the ALJ must consider Dr. Hogenmiller's recommendation of disability even though he could not give it controlling weight. She further asserts that Dr. Hogenmiller's "medical opinion as to the diagnosis, severity, and effects of fibromyalgia . . . must be given controlling weight, as it is a medical opinion that is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not

---

[4] The Court is cognizant that this reasoning gets things backwards because it implies that a claimant's ability to work is determined first and then used to assess the opinion evidence. *See Mascio*, 780 F.3d at 639. This error is harmless, however, because ALJ Mates's RFC is otherwise supported by substantial evidence, and Musser does not challenge this portion of his opinion.

inconsistent with other substantial evidence in the record." Pl.'s Br. 5 (citation omitted). This position is confusing, in part because Dr. Hogenmiller offered only one letter in which he stated the basis for his fibromyalgia diagnosis and relayed that he recommended Musser apply for disability. R. 712. As mentioned above, his letter does not touch on the severity or effects of fibromyalgia as it pertains to Musser's condition. His recommendation as to disability, to the extent it can be construed as an opinion on the severity of Musser's condition, is an issue reserved to the Commissioner and, as Musser correctly concedes, is not entitled to any specific weight. *See generally* 20 C.F.R. § 404.1527. There are no further opinions in the record from Dr. Hogenmiller addressing Musser's functional abilities. Because Dr. Hogenmiller presented no specific limitations and supported his recommendation that Musser apply for disability only with his diagnosis of fibromyalgia, the ALJ's decision to discount his opinion as inconsistent with other evidence in the record is supported by substantial evidence. After discussing the evidence of record, including the medical opinions, the ALJ articulated an appropriate RFC based on the discernible limitations. ALJ Mates thus determined that Musser was not disabled because of her fibromyalgia or any of her other impairments, and substantial evidence supports this conclusion.

## IV. Conclusion

For the foregoing reasons, I find that substantial evidence supports the Commissioner's final decision. Accordingly, the Court will **GRANT** the Commissioner's Motion for Summary Judgment, ECF No. 13, and **DISMISS** this case from the docket. A separate Order will enter.

The Clerk shall send certified copies of this Memorandum Opinion to all counsel of record.

ENTER: September 29, 2017

Joel C. Hoppe
United States Magistrate Judge